FILED
2022 Mar-31  PM 01:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| EDWARD RAY "CHIP" DILLARD and TIMOTHY WYLIE STAGGS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 3:21-cv-00295-HNJ |
| | ) | |
| LAUDERDALE COUNTY, ALABAMA, ANGIE KING HAMILTON, CHARLES "CHUCK" HEARN, and LESLIE SHEFFIELD, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This action proceeds before the court on Defendants Angie King Hamilton, Charles "Chuck" Hearn, and Leslie Sheffield's Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 12, 14, 16).[1] Plaintiffs Edward Ray "Chip" Dillard and Timothy Wylie Staggs lodge three counts in their First Amended Complaint pursuant to 42 U.S.C. § 1983, and the court determines Defendants merit dismissal of them all. Count I's alleged facts fail to sustain a Fourth Amendment malicious prosecution claim contending Hearn tendered a criminal complaint lacking probable

---

[1] Plaintiffs also named Lauderdale County, Alabama, as a defendant in their First Amended Complaint, in response to which the County filed a Motion to Dismiss due to Plaintiffs' erroneous conclusion that the County had any involvement in this case. (Doc. 10). Based upon the lack of any evidence the County had any involvement in this case, the court **GRANTS** the County's Motion to Dismiss and dismisses the claims against it **WITH PREJUDICE**.

cause, or containing intentional misstatements or omissions material to a finding of probable cause. Therefore, Hearn deserves qualified immunity as to that claim. Defendants warrant absolute immunity against Count II's Fourth Amendment malicious prosecution claim for a sexual abuse charge against Dillard: any alleged unlawful detention arose from the Defendant's grand jury testimony, and Dillard has not alleged any other appropriate basis to hold Defendants liable for his detention. As for Count III, Hamilton enjoys prosecutorial immunity against Plaintiffs' procedural due process claims regarding her alleged accession to the grand jury's determination of their bonds.

Therefore, based upon the following discussion, the court **GRANTS** Defendants' Motions to Dismiss.

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint if it fails to state a claim for which relief may be granted. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court revisited the applicable standard governing Rule 12(b)(6) motions to dismiss. First, courts must take note of the elements a plaintiff must plead to state the applicable claims at issue. *Id.* at 675.

After establishing the elements of the claim at issue, the court identifies all well-pleaded, non-conclusory factual allegations in the complaint and assumes their veracity. *Id.* at 679. Well-pleaded factual allegations do not encompass mere "labels and conclusions," legal conclusions, conclusory statements, or formulaic recitations and

threadbare recitals of the elements of a cause of action. *Id.* at 678 (citations omitted). In evaluating the sufficiency of a plaintiff's pleadings, the court may draw reasonable inferences in the plaintiff's favor. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).

Third, a court assesses the complaint's well-pleaded allegations to determine if they state a plausible cause of action based upon the identified claim's elements. *Iqbal*, 556 U.S. at 678. Plausibility ensues "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and the analysis involves a context-specific task requiring a court "to draw on its judicial experience and common sense." *Id.* at 678, 679 (citations omitted). The plausibility standard does not equate to a "probability requirement," yet it requires more than a "mere possibility of misconduct" or factual statements that are "merely consistent with a defendant's liability." *Id.* (citations omitted).

**BACKGROUND**

Plaintiffs' First Amended Complaint presents the following well-pleaded fact allegations.

### Dillard's Alleged Sexual Abuse of Sheffield

On August 18, 2015, Leslie Sheffield, a sergeant for the Lawrence County Drug Task Force, assisted the Lauderdale County Drug Task Force with an investigation of

Plaintiffs for committing alleged human trafficking.  (Doc. 5 at ¶ 9; Doc. 5–7 at 2–3).[2]
Sheffield assumed an undercover role as "Britney Wilson," an inmate arrested for drug
manufacturing, and wore an audio recording device.  (Doc. 5 at ¶¶ 14, 108–10; Doc. 5–
7 at 2–3).  Charles "Chuck" Hearn, an agent for the LCDTF, arranged for Sheffield to
appear before Judge Carol Medley for a "staged" initial appearance with Judge Medley's
knowledge and participation.  (Doc. 5 at ¶¶ 8, 14, 108; Doc. 5–7 at 2–3).  Before being
transported to the courthouse, Sheffield's collaborators shackled her hands and feet.
(Doc. 5 at ¶ 109; Doc. 5–7 at 3).

Plaintiff Edward Ray "Chip" Dillard, a criminal defense attorney unaware of the
undercover operation, represented Sheffield at the staged proceeding.  (Doc. 5 at ¶¶ 14,
109).  Hearn acted as the investigator for the fictious drug manufacturing case.  (*Id.*).
Angie King Hamilton, the Chief Assistant District Attorney at the time, acted as the
prosecutor for the case.  (*Id.* at ¶¶ 7, 14, 109).  At the initial appearance, Dillard stood
immediately to the right of Sheffield, who stood shackled with her hands in front of
her.  (*Id.* at ¶ 109).

The audio recording device that Sheffield wore captured the entire proceeding.
(*Id.* at ¶ 110).  The device captured Dillard "discussing with Sheffield matters pertinent
to her case and discussing with Judge Medley the lowering of Sheffield's bond amount."

---

[2] Plaintiffs attached several documents to their complaint as exhibits, including documents central to
the disputes at issue.  (*See* docs. 5–1 to 5–9).  Courts may consider documents attached to a complaint
when analyzing a motion to dismiss. *See Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th
Cir. 2007) (per curiam) (citation omitted)

(*Id.* at ¶ 112).  During the proceeding, Judge Medley handed Dillard a bond reduction order.  (*Id.* at ¶¶ 111, 113).  Dillard stated he would place the order into the breast pocket of Sheffield's jail uniform and Sheffield replied, "Okay."  (*Id.* at ¶ 113).  The device then captured "a sound suggestive of paper being inserted into Sheffield's pocket."  (*Id.*).  After the proceeding, Sheffield "casually talk[ed], jok[ed] and laugh[ed] with individuals whom she encounter[ed] as she exit[ed] the courtroom."  (*Id.* at ¶ 114).

Later that day, Sheffield drafted a report regarding the undercover operation. (Doc. 5 at ¶¶ 14, 117; Doc. 5–7 at 2–3).  In her report, she alleged Dillard fondled her breast as he placed the bond reduction order into the breast pocket of her jail uniform. (Doc. 5 at ¶¶ 14, 111).  Sheffield's report, in relevant part, reads as follows:

> On August 18th, 2015, I Sgt. Lesley Sheffield, with the Lawrence County Drug Task Force, was assigned to assist Lauderdale County Drug Task Force with a Human Trafficking case. While assisting, I acted in the official capacity as an Undercover Employee.
>
> During this investigation I was placed in the Lauderdale County jail as an inmate that had been arrested earlier in the morning hours on this date. Following my placement in the jail, a 72 hour hearing was arranged by the Agent Hearn.
>
> Before I was transported to the courthouse by Jail Administration, I went through the procedure of being shackled, my hands were placed in front of me and my feet were shackled together.
>
> We arrived at the courthouse, and I was escorted to the fourth floor of Judge Medleys [sic] courtroom.
>
> I sat in the courtroom until Judge Medley entered, and then I stood before her. I exchanged a brief conversation with my attorney Chip Dillard,and [sic] the hearing began to take place. When the hearing was finished, I was give [sic] a copy of my paperwork from the Judge. Mr. Dillard took the paperwork, and folded it in half. He made a remark to the effect of, here I'll get that for you, and

started trying to put the paper in a pocket that covered my left breast. He then put his hand down in the pocket with his palm facing my breast, and grabbed me several times as he was putting the paper in my pocket. When [Dillard] turned away from me I looked at Agent Chuck Hearn, who was sitting in the courtroom, to make sure I had a witness to this incident. I was shackled at the time this incident took place.

After the hearing I was escorted out of the courtroom and taken to the Sheriff's Officer, where I met with the other Agents involved in this case. They removed the shackles and a recording device that I had on me.

(Doc. 5 at ¶ 116; Doc. 5–7 at 2–3).

Subsequently, Hearn drafted and filed an "Agent's Memo" which included Sheffield's report.[3] (Doc. 5 at ¶¶ 14, 111). The memo, in relevant part, reads as follows:

My name is Chuck Hearn. I am a Police Officer for the Florence Police Department, in Florence, Alabama. I am currently assigned as an Investigator for the Lauderdale County Drug Task Force. I have been in law enforcement for approximately sixteen (16) years.

On 08/18/2015 Sgt. Leslie Sheffield (Lawrence County DTF) was used as an undercover officer for an operation with Lauderdale County Drug Task Force. On this date, Sheffield met with "Chip" Dillard during her 72 hour hearing in front of Judge Medley. The visit was recorded with audio. I requested a report from Sgt. Sheffield on this incident. Due to the different ways agencies complete their reports I was unable to open her report. Sgt [sic] Sheffield then emailed me a narrative that she copied and pasted from her report. I then copied her narrative and included [sic] in this report.

(Doc. 5 at ¶ 117; Doc. 5–7 at 2).

On May 26, 2016, Hamilton brought charges against the Plaintiffs before a grand jury, which thereto issued a secret indictment and arrest warrants for Plaintiffs. (Doc. 5 at ¶¶ 5–6, 11, 27, 118–19, 180). Both Sheffield and Hearn testified before the grand

---

[3] Hearn's memo contains no date. (Doc. 5–7 at 2–3).

jury as to Dillard's alleged fondling at the initial appearance, and based upon the testimony the indictment lodged a second-degree sexual abuse charge contending Dillard "intentionally subject[ed] another person to wit: L.S. a/k/a B.W., to sexual contact while the said L.S. a/k/a B.W. was incapable of consent." (Doc. 5 at ¶¶ 118–19; Doc. 5–1 at 4).   Dillard avers Sheffield and Hearn rendered false statements as to the alleged fondling. (Doc. 5 at ¶¶ 125–29).

Further, the grand jury charged Dillard with seven counts of human trafficking in the second-degree, four counts of conspiracy to commit human trafficking in the second-degree, and three counts of obstruction. (Doc. 5 at ¶¶ 5, 12; Doc. 5–1).  It also charged Staggs with five counts of human trafficking in the second-degree and four counts of conspiracy to commit human trafficking in the second-degree. (Doc. 5 at ¶¶ 6, 12; Doc. 5–1).  Plaintiffs underwent arrest the same day pursuant to the issued arrest warrants. (Doc. 5 at ¶¶ 5–6, 11, 16, 27, 180).

### Defendants' Bond Amounts

In addition, the grand jury set bond amounts and conditions as part of the indictment and arrest warrants. (Doc. 5 at ¶¶ 15, 181–82, 198; Doc. 5–1 at 11; Doc. 5–8 at 2).  The grand jury set Dillard's bond at $500,000 and required him to pay the full amount in cash only.  (*Id.*).  Similarly, the grand jury set Stagg's bond at $300,000 and required him to pay the full amount in cash only as well. (Doc. 5 at ¶¶ 15, 181, 183; Doc. 5–1 at 11).

On May 27, 2016, a Lauderdale County Circuit Judge convened an initial

appearance with Plaintiffs.  (Doc. 5 at ¶ 184; *Alabama v. Dillard*, CC-2016-000340.00, Doc. 2; *Alabama v. Staggs*, CC-2016-000342.00, Doc. 2).[4]  Adhering to the bond amounts and conditions recorded in the indictment and arrest warrants, the judge determined Dillard had to post a $500,000 cash only bond and Staggs had to post a $300,000 cash only bond to accomplish their respective releases.  (*Id.*).

A grand jury subsequently indicted Plaintiffs on additional charges.  (Doc. 5 at ¶¶ 16, 27, 187; Doc. 5–9).  The second grand jury charged Dillard with two counts of human trafficking in the first-degree, one count of human trafficking in the second-degree, and six counts of obstruction.  (Doc. 5 at ¶ 16; Doc. 5–9).  The grand jury set the bond at $225,000 and required Dillard to pay the full amount in cash only, bringing Dillard's total bond amount for both indictments to $725,000.  (Doc. 5 at ¶¶ 16, 187–89; Doc. 5–9).  Dillard could not post bond due to his indigency.  (Doc. 5 at ¶¶ 20, 186, 189).

The same grand jury also indicted Staggs on additional charges: two counts of human trafficking in the first-degree and one count of human trafficking in the second-degree.  (*Id.* at ¶ 16).  The grand jury set Stagg's bond for these additional charges at $100,000 and required him to pay the full amount in cash only, bringing his total bond

---

[4] The court may take judicial notice of Plaintiffs' state court criminal records found at www.alacourt.com.  *See Grider v. Cook*, 522 F. App'x 544, 545 n.2 (11th Cir. 2013) (per curiam) (citation omitted) ("[T]he district court was permitted to take judicial notice of Grider's state court criminal proceedings"); *see also Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014) (taking judicial notice of DeKalb County Superior Court Online Judicial System pursuant to Federal Rule of Evidence 201).

amount for both indictments to $400,000. (*Id.*). Staggs posted his $400,000 cash only bond and had to wear a GPS ankle monitor as a condition for his release. (*Id.*).

Dillard's counsel filed a motion in state court to reduce Dillard's bond and convert it from a cash only bond to either a surety or property bond. (*Id.* at ¶ 190). Pursuant to the motion, the state court lowered Dillard's bond to a $300,000 cash only bond. (*Id.*). The State of Alabama filed an emergency motion to reconsider Dillard's bond reduction and to stay the court's order reducing Dillard's bond. (*Id.*). The State based its motion on allegations made by Dillard's cellmate. (*Id.* at ¶ 190 n.22). The cellmate alleged Dillard rendered statements "threatening in nature toward victims, witnesses, law enforcement officers, and other State employees" involved in his investigation. (*Id.*). The cellmate also stated that he wanted help getting a lesser charge for his conveyance of Dillard's threats. (*Id.*). The state court granted the emergency motion and reinstated Dillard's original, $725,000 cash only bond. (*Id.* at ¶ 190).

Dillard's counsel filed another motion to reduce his bond. (*Id.* at ¶ 191). The state court reduced Dillard's bond to $648,000 with the requirement Dillard post $360,000 of that total in cash and secure the remaining by either cash or surety. (*Id.*). Dillard's counsel then filed a habeas petition in state court, challenging the constitutionality of his bond amount, the cash-only condition, and the setting of his bond by a grand jury, amongst other contentions. (*Id.* at ¶ 192). The court denied Dillard's habeas petition. (*Id.*).

## Hearn's Criminal Complaint Against Staggs for Human Trafficking

On August 10, 2017, S.T., a neighbor of Staggs, called the Florence Police Department to report she observed Staggs with a young girl riding in the back of his open bed truck. (*Id.* at ¶¶ 28, 66). Law enforcement officers, including Hearn, responded to the call and proceeded to Staggs's residence. (*Id.* at ¶ 29). At the residence, Staggs declared to the officers the young girl was his five-year-old granddaughter. (*Id.*). The officers detained Staggs as Hearn questioned S.T. (*Id.*).

During the interview, S.T. provided Hearn with a signed, handwritten statement discussing a conversation that allegedly transpired between her and Staggs. (*Id.*). S.T.'s written statement reads as follows:

> Yesterday I went to the mailbox. My neighbor Mr. Staggs approach [sic] me and ask [sic] me to find him two black girls that can suck a good dick but be a lady in the street. Yesterday he pulled up but my husband didn't answer. Today he knocked on the door and was ask [sic] to leave and never come back. But he had a little girl in the back of his truck and that's when I flipped out totally and called Florence Police. Also he offer [sic] to pay me $200 for the girls. He offer [sic] to pay me $200.00 for two black girls and he wanted one of the black girls to go live with him in Tenn. when his ankle bracelets get removed in December.

(Doc. 5 at ¶ 33; 5–2 at 2–3).

As a result of the foregoing circumstances, Hearn filed a criminal complaint against Staggs for human trafficking in the first-degree. (Doc. 5 at ¶ 31). Hearn's complaint reads as follows:

> On 08/09/2017 Timothy Staggs approached a female (S.T.) and asked her to find two young girls for him. He stated that he would pay Taylor $200.00 if she would locate two young girls and that they "needed to suck a good dick but be a lady in the street." He further told her that he would want one of them to live

with him and work for him but she could not have a boyfriend and could not see anyone. He further stated that the girl would live with him in Tennessee. On 8/10/2017 the female (S.T.) saw Staggs with a small child in his truck and became worried. She then called police.

(Doc. 5 at ¶ 34; 5–3 at 2).

Based upon Hearn's complaint, a magistrate judge issued an arrest warrant for Staggs. (Doc. 5 at ¶ 31; Doc. 5–4 at 2). The arrest warrant asserted Hearn's complaint established probable cause that Staggs engaged in human trafficking vis-à-vis Hearn's averments. (Doc. 5 at ¶ 32; Doc. 5–4 at 2). That same day, Staggs underwent arrest pursuant to the warrant. (Doc. 5 at ¶¶ 6, 18, 35). In addition, the state court revoked Staggs's bond based upon the new charge. (*Id.*).

A grand jury then indicted Staggs for human trafficking based upon the alleged August 2017 incident. (Doc. 5 at ¶ 36; Doc. 5–5 at 2). The indictment stated Staggs "knowingly recruit[ed] and/or solicit[ed] a minor or minors for the purpose of causing a minor or minors to engage in sexual servitude." (*Id.*). Furthermore, the indictment listed Hearn as the sole state witness. (*Id.*).

## **Procedural History**

On February 11, 2019, Plaintiffs' trial commenced on 27 charges and lasted approximately three weeks (Dillard's nine obstruction charges and Staggs's August 2017 human trafficking charge had separate trial dates). (Doc. 5 at ¶¶ 22, 37). During the final week of the trial, the state court *nol prossed* three of Dillard's human trafficking charges from the July 2016 indictment. (*Id.* at ¶ 22). On March 1, 2019, the jury

acquitted Plaintiffs of all charges.  (*Id.* at ¶¶ 5–6, 23, 37, 122).

Following the acquittal, the state court reduced Dillard's bond to $117,000, and it did not require a cash only payment.  (*Id.* at ¶ 194).  Subsequently, Dillard posted a property bond, secured by the home of an extended family member, and the state court released him on house arrest with a GPS ankle monitor.  (*Id.*).  On May 22, 2019, the state court *nol prossed* Staggs's August 2017 human trafficking charge.  (*Id.* at ¶¶ 6, 24, 38; Doc. 5–6 at 3).

Plaintiffs filed an initial Complaint followed by the operative First Amended Complaint, alleging constitutional violations pursuant to 42 U.S.C. § 1983.  In Count I, Plaintiffs claim that Hearn's criminal complaint against Staggs for Human Trafficking lacked probable cause to obtain an arrest warrant, and further, he intentionally lodged material misstatements and omissions in the complaint.  In Count II, Plaintiffs assert Defendants did not have probable to cause to advance a sexual abuse charge against Dillard based upon the alleged fondling of Sheffield, conspired to fabricate and present false testimony to a grand jury, and fabricated evidence to institute a criminal prosecution against Dillard.  In Count III, Plaintiffs aver that Hamilton acquiesced in the grand jury's setting of their respective bond amounts.

DISCUSSION

**I.    Hearn's Criminal Complaint Contained Sufficient Information to Establish Probable Cause and Plaintiffs Do Not Sufficiently Allege Hearn Intentionally Rendered Misstatements or Omissions in his Complaint**

In Count I of the First Amended Complaint, Staggs challenges his August 2017 arrest and detention for human trafficking as a malicious prosecution in violation of the Fourth Amendment.  Staggs specifically claims that Hearn "should have known that his [criminal complaint] failed to establish probable cause" for an arrest warrant and that he "intentionally or recklessly made misstatements or omissions [in his complaint] . . . necessary to support the warrant."  (Doc. 5 at ¶ 42) (citing *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. 2020)).  Pursuant to Hearn's motion to dismiss and the applicable legal standards, Hearn enjoys qualified immunity to the count because Dillard's allegations fail to state a claim for malicious prosecution in violation of the Fourth Amendment.

"Qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Carruth v. Bentley*, 942 F.3d 1047, 1053 (11th Cir. 2019) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted).  Simply put, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (citation omitted).  To obtain qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary

13

authority when the allegedly wrongful acts occurred." *Carruth*, 942 F.3d at 1054 (citation and internal quotation marks omitted).  There exists no dispute the Defendants engaged in discretionary functions when performing all of the acts contested by Plaintiffs.

After this showing, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* (citation and quotation marks omitted).  "'Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible.'" *Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).  Officials who acted within their discretionary authority "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).   As the following analyses reveal, Hearn did not violate Staggs's Fourth Amendment rights vis-à-vis the August 2017 arrest and detention.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.; *see Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020) ("One of the [Fourth] Amendment's protections is the right to be free from arrest without probable cause."

14

(citation omitted)), *cert. denied*, 2021 WL 666396 (U.S. 2021); *Paez*, 915 F.3d at 1285) ("An arrest made without probable cause is an unreasonable seizure." (citing *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010)); *id* ("[T]he law requires that a warrant for an arrest be supported by 'sufficient information to establish probable cause.'" (citations omitted)). Staggs argues Hearn violated his Fourth Amendment right to be free from an unreasonable seizure as a result of a malicious prosecution.

For a Fourth Amendment malicious prosecution claim, Staggs must prove "he suffered a seizure pursuant to legal process that violated the Fourth Amendment . . . and satisfy the elements of the common law tort of malicious prosecution." *Luke v. Gulley*, 975 F.3d 1140, 1143 (11th Cir. 2020) (citation and internal quotation marks omitted). Noting a significant overlap exists between a Fourth Amendment violation pursuant to legal process and a common law malicious prosecution claim, *Luke*, 975 F.3d at 1144, the Eleventh Circuit streamlined the Fourth Amendment malicious prosecution standard into two elements: "a plaintiff must prove (1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against him terminated in his favor." *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022) (citing *Luke*, 975 F.3d at 1144) (internal quotation marks omitted). There exists no dispute Staggs satisfied the second prong because a jury acquitted him of the pertinent charge.

To establish the first prong of the Fourth Amendment malicious prosecution standard, a plaintiff must demonstrate "the legal process justifying his seizure was

constitutionally infirm," and "his seizure would not otherwise be justified without legal process." *Luke*, 975 F.3d at 1144 (citing *Williams,* 965 F.3d at 1165). Staggs satisfied the latter requirement because he was arrested on the criminal complaint, and his bond revocation resulted in a prolonged detention that could not be justified without legal process. *See Williams*, 965 F.3d at 1167 ("Even if the officers had probable cause to arrest [plaintiff] for attempted murder, [his] seizure was far too long to be justified without legal process." (citing *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991))). Therefore, the analysis centers on whether the legal process causing the detention – the legal proceeding underlying the arrest warrant – was constitutionally infirm.

The legal process prescription under the Fourth Amendment includes proceedings to secure an arrest warrant. *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016) (citation omitted); *see also Laskar v. Hurd*, 972 F.3d 1278, 1285 (11th Cir. 2020) ("Laskar alleges that he suffered a seizure pursuant to legal process. . . . Laskar alleges that state law enforcement obtained a warrant for his seizure. He also alleges that he was arrested and 'deprived of his personal liberty.' Taken together, these allegations suffice to plead a seizure pursuant to legal process."). To prove the constitutional infirmity of an arrest warrant, a plaintiff may establish either "the officer who applied for the warrant should have known that his application failed to establish probable cause," or "an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Williams*, 965 F.3d at 1165 (citations omitted). The court will first analyze

whether Hearn should have known that his complaint failed to establish probable cause.

## A.      Hearn's Criminal Complaint Established Probable Cause

For this species of a Fourth Amendment malicious prosecution claim, the question ensues "whether a reasonably well-trained officer in [Hearn's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 345 (1986) (footnote omitted).  "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable . . . will the shield of immunity be lost." *Malley*, 475 U.S. at 344-45 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)); *see also Kelly v. Curtis*, 21 F.3d 1544, 1555 (11th Cir. 1994) ("[T]he Supreme Court held that qualified immunity does not protect an officer who seeks a warrant on the basis of an affidavit that does not show reasonably objective probable cause—even if the magistrate erroneously issues the warrant." (citing *Malley*, 475 U.S. at 344-45)).

This standard does not allow an officer to rehabilitate "an otherwise insufficient affidavit" with information not disclosed to the issuing magistrate judge.  *Id.* (citing *Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971)).  Thus, courts must consider "whether 'the judicial officer issuing such a warrant [was] supplied with sufficient information to support an independent judgment that probable cause exists for the warrant.'" *Williams*, 965 F.3d at 1162 (quoting *Whiteley*, 401 U.S. at 564); *see also id.* at 1162-63 ("[W]arrantless arrests concern whether the facts known to the arresting officer establish probable cause, while seizures pursuant to legal process concern whether the judicial officer who

17

approved the seizure had sufficient information to find probable cause."); *W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) (finding judicial review of whether an officer's affidavit contains probable cause "must be strictly confined to the information brought to the magistrate's attention" (citations omitted)).

As for the probable cause standard itself, "the Supreme Court explained that probable cause exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.'" *Washington*, 25 F.4th at 898 (quoting *Wesby*, 138 S. Ct. at 586 (internal quotation marks omitted)). "Probable cause does not require conclusive evidence and 'is not a high bar.'" *Id.* at 899 (quoting *Wesby*, 138 S. Ct. at 586 (internal quotation marks omitted)). A showing of probable cause "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Wesby*, 138 S. Ct. at 586 (citations omitted). "A reviewing court must simply ask 'whether a reasonable officer *could* conclude . . . that there was a substantial chance of criminal activity.'" *Washington*, 25 F.4th at 899 (quoting *Wesby*, 138 S. Ct. at 588) (emphasis in original).

The existence of probable cause "'depends on the elements of the alleged crime and the operative fact pattern.'" *Stallworth v. Hurst*, No. 21-10731, 2021 WL 6143557, at *2 (11th Cir. Dec. 30, 2021) (per curiam) (citing *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018)). Courts must not examine facts in isolation but "'consider the whole picture' because 'the whole is often greater than the sum of its parts.'" *Manners v.*

*Cannella*, 891 F.3d 959, 969 (11th Cir. 2018) (citing *Wesby*, 138 S. Ct. at 588). "Because probable cause 'deals with probabilities and depends on the totality of the circumstances,' . . . it is 'a fluid concept' that is 'not readily, or even usefully, reduced to a neat set of legal rules.'" *Wesby*, 138 S. Ct. at 586 (citations omitted). Lastly, "in deciding whether probable cause exists, [officers] are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for [probable cause]." *Paez*, 915 F.3d at 1286 (citation and internal quotation marks omitted).

Based upon the foregoing legal standard, the court must determine whether Hearn's criminal complaint contained sufficient information evincing probable cause to arrest Staggs for human trafficking in the first-degree.[5] In relevant part, the statute provides:

> (a) A person commits the crime of human trafficking in the first degree if:
>
> > (1) He or she knowingly subjects another person to labor servitude or sexual servitude through use of coercion or deception.
> >
> > (2) He or she knowingly obtains, recruits, entices, solicits, induces, threatens, isolates, harbors, holds, restrains, transports, provides, or maintains any minor for the purpose of causing a minor to engage in

---

[5] "If the warrant stated that its issuance was based on probable cause shown, . . . [the court] might presume that oral testimony was presented which supported the magistrate's determination." *Garmon v. Lumpkin Cty., Ga.*, 878 F.2d 1406, 1409 n.1 (11th Cir. 1989). The court does not consider such oral testimony in this case, however, because "the warrant explicitly states that it is supported by information . . . [in Hearn's complaint]." *Id.*; *c.f.*, *Stefani v. City of Grovetown*, 780 F. App'x 842, 851 n.4 (11th Cir. 2019) (per curiam) ("Because the arrest warrants were expressly issued based on the affidavit and 'oral testimony given under oath,' we consider both the affidavit and [the officer's] oral testimony." (citations omitted)).

sexual servitude.

(3) For purposes of this section, it is not required that the defendant have knowledge of a minor victim's age, nor is reasonable mistake of age a defense to liability under this section.

2010 Ala. Laws Act 2010-705, Ala. Code § 13A-6-152 (2010) (amended 2018).[6]  The

pertinent statutory definitions provide as follows:

(1) COERCION. Any of the following:

a. Causing or threatening to cause physical injury or mental suffering to any person, physically restraining or confining any person, or threatening to physically restrain or confine any person or otherwise causing the person performing or providing labor or services to believe that the person or another person will suffer physical injury or mental suffering.

b. Implementing any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in physical injury, mental suffering, or physical restraint of any person.

. . .

g. Rape or sodomy or threatened rape or sodomy of any person, as defined in Title 13A.[7]

. . .

---

[6] Alabama amended the statute in 2018, and thus, the court provides the statue and all relevant definitions as they existed in August 2017.

[7] At the time of the alleged offense, Alabama defined rape in the first-degree, in part, as a person, "being 16 years old or older, [who] engages in sexual intercourse with a member of the opposite sex who is less than 12 years old." 2000 Ala. Laws Act 2000-726, Ala. Code § 13A-6-61 (2000) (amended 2019).  In addition, at the time of the alleged offense Alabama defined sodomy in the first-degree as a person, "being 16 years old or older, [who] engages in deviate sexual intercourse with a person who is less than 12 years old."  1977 Ala. Laws 1977-607, Ala. Code § 13A-6-63 (1977) (amended 2019). Alabama defined "deviate sexual intercourse" at the time as "[a]ny act of sexual gratification between persons not married to each other involving the sex organs of one person and the mouth or anus of another."  1977 Ala. Laws 1977-607, Ala. Code § 13A-6-60 (1977) (repealed 2019).

(3) LABOR SERVITUDE. Work or service of economic or financial value which is performed or provided by another person and is induced or obtained by coercion or deception.

. . .

(5) MINOR. A person under the age of 18.

. . .

(7) SEXUAL SERVITUDE. Any of the following:

> a. Any sexual conduct . . . for which anything of value is directly or indirectly given, promised to, or received by any person, which conduct is induced or obtained by coercion or deception from a person.

2010 Ala. Laws Act 2010-705, Ala. Code § 13A-6-151 (2010) (amended 2018).

Hearn's criminal complaint readily evinces probable cause that Staggs violated the foregoing provisions.  Distilling the pertinent provisions, a perpetrator commits human trafficking in the first degree by recruiting, soliciting, inducing, or transporting a minor to engage in sexual servitude.  The statutes define sexual servitude alternately as giving someone money to engage in coerced sexual conduct (i.e., rape or sodomy) with a minor.

Hearn declared in his criminal complaint that on August 9, 2017, Staggs approached S.T. and offered her $200 to find him "two young girls" that "needed to suck a good dick but be a lady in the street."  These statements demonstrate Hearn's assessment that Staggs offered money to S.T. to recruit or solicit "young girls" to engage in sexual conduct.  A reasonable officer could also maintain that by alleging the procurement of "young girls," the complaint averred Staggs desired to obtain minors

to engage in such sexual conduct, which would violate the rape or sodomy statutes.

The complaint also averred Staggs desired one of the girls to live with and work for him in Tennessee, but the girl could not have a boyfriend or see anyone. This averment reasonably establishes Staggs planned to transport a minor from Alabama to Tennessee to engage in sexual conduct given the other averments. In addition, a reasonable officer could maintain that Staggs would threaten physical injury and emotional suffering to confine the minor so that she could not have a boyfriend or see anyone. Staggs even admits that such an allegation "lend[s] the impression of the controlling behavior frequently associated with human traffickers." (Doc. 5 at ¶ 52).

Lastly, the complaint discussed that on August 10, 2017, S.T. became worried when she observed Staggs with a small child in his truck and called the police. Based on the totality of the circumstances, a reasonable officer could discern a "probability or substantial chance" that Staggs procured this child in exchange for money and intended to subject the child to sexual servitude through the use of either physical confinement, emotional suffering, rape, or sodomy. Thus, Hearn's complaint established probable cause to arrest Staggs for human trafficking in the first-degree under Alabama Code § 13A-6-152. Accordingly, Staggs failed to demonstrate that Hearn should have known that his complaint failed to establish probable cause.

Staggs's representation that the five-year-old girl in the truck was his granddaughter does not mar the probable cause finding. Hearn sustained "no obligation to give any credence to [Staggs's] story." *Andrews v. Marshall*, No.

216CV814FTM99MRM, 2019 WL 11638833, at *4 (M.D. Fla. May 8, 2019), *aff'd*, 845 F. App'x 849 (11th Cir. 2021) (internal quotation marks omitted) (citing *Williams v. City of Homestead, Fla.*, 206 F. App'x 886, 888–89 (11th Cir. 2006)); *see Wesby*, 138 S. Ct. at 588 ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."); *Huebner v. Bradshaw*, 935 F.3d 1183, 1188 (11th Cir. 2019) ("[Officer] was 'not required to forego arresting' [the plaintiff] 'based on initially discovered facts showing probable cause simply because [the plaintiff] offered a different explanation.'" (citations omitted)).

Furthermore, S.T. does not constitute an unreliable source simply because she offered a lone, signed, handwritten statement detailing her allegations. *Davis v. Orange Cty. Sheriff's Off.*, No. 620CV1400ORL37DCI, 2020 WL 6144654, at *2 (M.D. Fla. Oct. 6, 2020) ("The Eleventh Circuit has recognized that a single witness'[s] statements are enough to establish probable cause." (citing *Martin v. Wood*, 648 F. App'x 911, 916 (11th Cir. 2016)); *see United States v. Hodge*, 714 F.3d 380, 384–85 (6th Cir. 2013) ("Statements from a source named in a warrant application . . . are generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability." (citation omitted)). Moreover, Hearn's knowledge that Staggs faced several charges for human trafficking buttressed the reliability of S.T.'s statement, and more concretely, the reasonableness of the probable cause determination. *See Mears v. McCulley*, 881 F. Supp. 2d 1305, 1323–24 (N.D. Ala. 2012) ("An individual's prior convictions support a finding of probable cause

to arrest, so long as the prior conviction had probative value to the arresting officer in concluding that the arrestee committed a crime." (citing *Brinegar v. United States*, 338 U.S. 160, 172–78 (1949) (holding a police officer's knowledge of an individual's prior arrest and pending charges contributed to a finding of probable cause); *United States v. Lindsey*, 482 F.3d 1285, 1292 (11th Cir. 2007) (holding that the knowledge of police officers that the defendant was previously convicted of armed robbery added to a finding of probable cause to arrest for being a felon in possession of a firearm))); *see also* 2 Wayne R. LaFave, *Search and Seizure* § 3.2(d) (6th ed. Dec. 2021 Update) ("[A] suspect's prior convictions and prior arrests or charges are not barred from consideration on the issue of probable cause) (footnotes omitted); *id.* at § 3.4(c) ("[A] person's past criminal record and other similar facts may be taken into account in making a probable cause determination.").

Plaintiffs argue that Hearn "elect[ed] not to obtain easily discoverable facts" that could have exculpated Staggs because Hearn "could have easily and quickly acquired the GPS data from Staggs's ankle monitor to verify S.T.'s claims of Staggs's being on her property . . . ."  (Doc. 5 at ¶ 69) (citing *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018)).  Based on the facts known to Hearn at the time, probable cause existed to conclude Staggs had committed human trafficking, and thus, the law did not require Hearn "to sift through conflicting evidence" because "the totality of the circumstances [already] present[ed] a sufficient basis for believing that an offense ha[d] been committed."  *Huebner*, 935 F.3d at 1188 (citation omitted); *Davis*, 2020 WL, at *2

("If it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause." (citation and internal quotation marks omitted)). The circumstances do not depict a situation in which Staggs conducted an investigation in a biased manner, deliberately elected not to obtain the GPS date, or consciously ignored any GPS data that he already possessed. *See Washington v. Rivera*, 939 F.3d 1239, 1248 (11th Cir. 2019) (explaining prior Eleventh Circuit case law found officers liable when they "conduct an investigation in a <u>biased</u> fashion or <u>elect</u> not to obtain easily discoverable facts," or "consciously ignore[ ] information they already possessed that cast significant doubt on whether a [person] was guilty" (citations omitted)).

Therefore, a reasonable officer in Hearn's position would not have known his criminal complaint failed to establish probable cause.

## B. Hearn Did Not Lodge Any Intentional or Reckless Misstatements or Omissions in His Criminal Complaint

In the same fashion, Hearn did not intentionally or recklessly lodge any material misstatements or omissions in his criminal complaint. To prevail on his allegations, Staggs must "'identify affirmative evidence from which a jury could find that'" Hearn lied in his criminal complaint. *Williams*, 965 F.3d at 1166 (citation omitted). "Negligent misstatements or omissions" do not violate the Fourth Amendment. *Paez*, 915 F.3d at 1287 (citing *Kelly*, 21 F.3d at 1555). The Eleventh Circuit deploys a two-part test for the inquiry at bar. "First, we ask whether there was an intentional or reckless

misstatement or omission." *Id.* "Then, we examine the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included." *Id.* (citations omitted).

As for the first part of the test, "qualified immunity bars such claims unless 'the plaintiff can prove that the officer *perjured himself* -- that is, put forth information *he did not believe or accept as true* -- in order to obtain a search warrant.'" *Woodring v. Hart*, No. 614-CV-1067-ORL-37, 2015 WL 2238056, at *3 (M.D. Fla. May 12, 2015) (emphasis in original) (quoting *Carter v. Gore*, 557 F. App'x 904, 908 (11th Cir. 2014)). "Accordingly, at the motion to dismiss stage, viably alleging a perjurious-statement malicious-prosecution claim requires factual allegations bearing on the officer's 'subjective belief about the veracity of the assertions made in his affidavit.'" *Id.* (citing *Carter*, 557 F. App'x at 910). "'General attacks upon a defendant's credibility' are not enough to meet this burden. . . .  Nor are conclusory allegations and speculation." *Williams*, 965 F.3d at 1165–66 (citations omitted).

Staggs alleges Hearn's complaint "is based on—and directly quotes from—S.T.'s [handwritten] statement" and contains "material misstatements, omissions and fabrications" as to what S.T.'s statement alleged.  (Doc. 5 at ¶¶ 50–51, 54).  Specifically, Staggs alleges that Hearn "intentionally or recklessly made misstatements or omissions necessary to" establish probable cause to arrest Staggs for human trafficking.  (*Id.* at ¶¶ 49, 54) (citing *Williams*, 965 F.3d at 1165).

Staggs identify the following statements in the criminal complaint as material

misstatements or omissions.  In S.T.'s statement, she alleged Staggs offered her $200 to find him two "black" girls, whereas Hearn declared in his complaint that Staggs offered S.T. $200 to find him two "young" girls.  Next, S.T. alleged in her statement that Staggs "wanted one of the black girls to go live with him in [Tennessee]" upon removal of his ankle monitor.  In comparison, Hearn's complaint declares Staggs "want[ed] one of [the girls] to live with him and work for him [in Tennessee] but she could not have a boyfriend and could not see anyone."  Lastly, S.T. alleged Staggs "had a little girl in the back of his truck" while Hearn's complaint states S.T. "saw Staggs with a small child in his truck."

Staggs does not sufficiently allege that Hearn intentionally or recklessly lodged misstatements and omissions in his complaint.  The foregoing statements do not constitute material misstatements or omissions.  As for the first contested statement, Hearn's reference to "young girls" rather than "black girls" does not represent a misstatement or omission.  The race or ethnicity of a minor bears no relevance for a human trafficking charge.  And adding the descriptor "young" to the noun "girls" does not materially misstate any of S.T.'s declarations.  Alabama's human trafficking statute applied to any type of minor, including "girls," whether "young," teen, or any other designation.  The same conclusion applies to the third, contested statement referenced previously:  the distinction between "little girl in the back of his truck" and "small child in his trick" reflects a trivial concern when either formulation supports the finding of probable cause.

The second, alleged misstatement or omission – Hearn's allusion that Staggs did not want the minor to "have a boyfriend and could not see anyone" – reflects a flaw in Staggs's reasoning.  The crux of Staggs's argument hinges on his allegation that Hearn based his complaint on S.T.'s handwritten statement, and thus, any deviation from her statement signals Hearn intentionally lied in his complaint in an effort to establish probable cause.  The court disagrees.

As recounted previously, Hearn questioned and interviewed S.T. when he responded to her 911 emergency call.  Therefore, in addition to S.T.'s written statement, Hearn obtained information from S.T. during the interview.  And other than conclusory allegations and speculation, Staggs does not allege S.T. never made such allegations; he only alleges that she did not make such allegations in her handwritten statement.  That Hearn included information not found in S.T.'s handwritten statement does not plausibly suggest the additional information reflects an intentional misrepresentation given the interview he conducted with S.T.

Notwithstanding Staggs's allegation that Hearn based his complaint on S.T.'s handwritten statement, the court does not find it plausible that Hearn solely based his complaint on the information contained within S.T.'s handwritten statement given that he also interviewed her.  Therefore, Staggs fails to plausibly suggest that Hearn subjectively did not believe the veracity of the allegations in his complaint.  *See Carter*, 557 F. App'x at 910 (dismissing a malicious prosecution claim based on an alleged *Franks* violation because the plaintiff failed to "allege facts to plausibly suggest that [the

affiant-officer] did not believe or appropriately accept as true his ultimate assertion that [the plaintiff] was guilty"); *c.f. Kelly*, 21 F.3d at 1548 (finding a police officer submitted an affidavit for an arrest warrant against the plaintiff for possession of cocaine, notwithstanding the fact that the officer knew plaintiff did not possess a controlled substance).  Therefore, Hearn's criminal complaint did not contain any intentional or reckless misstatements or omissions.

Based upon the foregoing review, Hearn deserves qualified immunity to the Fourth Amendment malicious prosecution claim in Count I of the Amended Complaint.

## II.    Hamilton, Hearn, and Sheffield Enjoy Absolute Immunity Against Dillard's Fourth Amendment Claim Regarding the Sexual Abuse Charge.

In Count II of the Complaint, Dillard claims Hamilton, Hearn, and Sheffield violated his Fourth Amendment right against unreasonable seizures and unlawful detentions (termed a malicious prosecution) because they fabricated the facts underlying the sexual abuse charge levied against him.  All three Defendants enjoy absolute immunity to this claim because it rests upon Hamilton's acts as a prosecutor and the other Defendants' testimony during a grand jury proceeding.  There exists no other conduct supporting a Fourth Amendment malicious prosecution claim.

As an initial matter, the nature of the claim at issue guides the focus upon the pertinent conduct.  Dillard advances a Fourth Amendment claim for malicious prosecution.  Fundamentally for the allegations at bar, a Fourth Amendment claim

requires an unlawful *seizure* pursuant to legal process. *Laskar*, 972 F.3d at 1284; *Williams*, 965 F.3d at 1157–59. The alleged, unlawful seizure Dillard suffered constitutes his arrest and pretrial detention pursuant to the grand jury's indictment and the arrest warrant issued thereto. And the role Defendants played in effecting Dillard's arrest and pretrial detention rests upon Hamilton's conduct in securing the sexual abuse charge from the grand jury, and Hearn's and Sheffield's testimony rendered during the grand jury proceedings. All of their conduct warrants absolute immunity from Dillard's Fourth Amendment claim.

As for Hamilton's conduct, "prosecutors enjoy absolute immunity for the initiation and pursuit of criminal prosecution." *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999) (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)). "The official seeking absolute immunity bears the burden of showing such immunity is justified." *Id.* (citations omitted). Prosecutors only have absolute immunity for activities "'intimately associated with the judicial phase of the criminal process.'" *Rehberg v. Paulk*, 611 F.3d 828, 837 (11th Cir. 2010) (citations omitted), *aff'd*, 566 U.S. 356 (2012). "This functional approach looks to 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* (citations omitted).

Therefore, "[p]rosecutors are immune for appearances in judicial proceedings, including prosecutorial conduct before grand juries, statements made during trial, examination of witnesses, and presentation of evidence in support of a search warrant during a probable cause hearing." *Rehberg*, at 837–38 (citations omitted). In addition,

30

absolute immunity also "extends to a prosecutor's acts undertaken . . . in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Id.* at 838 (citations and internal quotation marks omitted).

Thus, regardless whether probable cause existed to charge Dillard with sexual abuse, Hamilton enjoys absolute immunity for acting as an advocate for the State and for presenting the State's case before the grand jury. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 274 n.5 (1993) (explaining "a prosecutor would be entitled to absolute immunity for the malicious prosecution of someone whom he lacked probable cause to indict" because the Court "found a common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not"); *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279–80 (11th Cir. 2002) ("[I]t is clear that, even if [a prosecutor] knowingly proffered perjured testimony . . ., [s]he is entitled to absolute immunity from liability for doing so."); *Watkins v. Dubreuil*, 820 F. App'x 940, 945 (11th Cir. 2020) (per curiam) (finding prosecutors enjoyed absolute immunity when plaintiff alleged prosecutors initiated and pursued a baseless prosecution); *id.* ("A prosecutor is entitled to absolute immunity for . . . the filing of charges." (citation and internal quotation marks omitted)).

As for Hearn and Sheffield, Dillard asserts the grand jury issued an indictment "predicated solely" on Sheffield's false allegations that he fondled her breast during a staged initial appearance. He contends Hearn and Sheffield (along with Hamilton)

31

conspired to present false testimony to the grand jury and prevailed in doing so by testifying at the grand jury proceeding.

Witnesses enjoy absolute immunity from claims stemming from their grand jury testimony. *Rehberg*, 566 U.S. at 367 ("[A] grand jury witness has absolute immunity from any § 1983 claim based on the witness'[s] testimony."). "Police officers enjoy the same absolute immunity as lay witnesses for their testimony . . . in front of the grand jury." *Jones*, 174 F.3d at 1281; *see Rehberg*, 566 U.S. at 367 ("Neither is there any reason to distinguish law enforcement witnesses from lay witnesses."). In addition, witnesses enjoy absolute immunity for claims of conspiracy to present false testimony and any preparatory activity to render the testimony. *See Rehberg*, 566 U.S. at 369–70 (finding absolute immunity "may not be circumvented by claiming that a grand jury witness conspired to present false testimony" or attempting to bring a claim for "preparatory activity" regarding grand jury testimony); *Rehberg*, 611 F.3d at 841 (finding a prosecutor and officer "immune for their alleged conspiracy to fabricate and present false testimony to the grand jury). Thus, the law entitles Hearn and Sheffield to absolute immunity for any alleged conspiracy to present false testimony and any alleged, false testimony proffered before the grand jury.

Notwithstanding the clear applicability of the absolute immunity doctrine to Dillard's claim, he latches his Fourth Amendment malicious prosecution claim onto the report and memo Sheffield and Hearn respectively drafted regarding the alleged incident underlying the sexual abuse charge. At first blush, these documents

conceivably fall within *Rehberg*'s admonition that a § 1983 litigant cannot maintain a claim regarding a witness's preparatory activity for rendering allegedly fabricated grand jury testimony.   As Dillard indicates, however, Defendants drafted these statements several months before the grand jury proceedings;[8] therefore, the statements may fall within the *Rehberg* directive that absolute immunity does not extend to "all activity that a witness conducts outside of the grand jury room," such as the falsification of affidavits and the fabrication of evidence.  *Rehberg*, 566 U.S. at 370 n.1 (citing *Kalina v. Fletcher*, 522 U.S. 118, 129–131 (1997); *Malley*, 475 U.S. 335, 340–345; *Buckley*, 509 U.S., at 272–276). For those reasons, Dillard seeks to hold Defendants liable for instituting a malicious prosecution by fabricating evidence.

Dillard's entreaty in this regard likewise fails.  As an initial matter, the Supreme Court rejected the Fourteenth Amendment's substantive due process doctrine as a foundation for a malicious prosecution claim vis-à-vis pre-trial conduct[9]: the Court reminded litigants "the accused is not 'entitled to judicial oversight or review of the decision to prosecute.'"  *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (citations omitted). Rather, the Court identified the Fourth Amendment as the source of constitutional

---

[8] Sheffield's report reflected a date of August 18, 2015, Hearn indicated he drafted his memo around the same time, and the grand jury convened on May 26, 2016.

[9] "[O]nce a trial has occurred, the Fourth Amendment drops out:  A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment."  *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 n.8 (2017).  Therefore, a litigant may maintain a claim based upon the Fourteenth Amendment's Due Process Clause if there ensues a wrongful conviction or imprisonment based upon fabricated evidence.

rights for "*deprivations of liberty* that go hand in hand with criminal prosecutions."  *Id.* (emphasis added) (citation omitted); *see also Tinney v. Shores*, 77 F.3d 378, 381 (11th Cir. 1996) ("[A]n allegation of prosecution without probable cause must . . . be analyzed under the Fourth Amendment . . . ."(citation omitted)); *Rehberg*, 611 F.3d at 853 ("[U]nder the Fourteenth Amendment, there is no substantive due process right to be free from malicious prosecution without probable cause. . . . A malicious prosecution claim arises under the Fourth Amendment, not Fourteenth Amendment substantive due process."(citation omitted)); *Jordan v. Mosley*, 298 F. App'x 803, 806 (11th Cir. 2008) (Malicious prosecution "is an independent cause of action that potentially is cognizable under the Fourth Amendment."(citing *Uboh v. Reno*, 141 F.3d 1000, 1002–03 n.4 (11th Cir. 1998) (holding if malicious prosecution or abuse of process is committed by state actors and results in the arrest or other seizure of defendant, the defendant's only remedy is under the Fourth Amendment), *abrogated on other grounds by Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019)).  Therefore, as countenanced previously, to advance his Fourth Amendment malicious prosecution claim Dillard needs to demonstrate he suffered a *seizure* pursuant to *legal process.  Luke*, 975 F.3d at 1143.

And Dillard fails that standard vis-à-vis his attempt to use Sheffield's report and Hearn's memo as a basis for his claim.  First, there exists no averments Defendants used those documents during any form of legal process.  Pursuant to the First Amended Complaint and prevailing facts, the grand jury indictment for sexual abuse rested upon Sheffield's and Hearn's testimony, not their documents.  A Fourth Amendment

malicious prosecution claim requires that the offending conduct affect a legal process, and Dillard's allegations regarding the mere drafting of fallacious documents do not satisfy this requirement.  In the prevailing cases cited by the *Rehberg* decision, authorities violated the Fourth Amendment by tendering false complaints to secure arrest warrants. *See Kalina*, 522 U.S. at 122 (use of alleged fabricated evidence during the course of a legal proceeding); *Malley*, 475 U.S. at 338, 340–41 (same).[10]

More importantly, Dillard's allegations do not reveal how Hearn's and Sheffield's documents led to any alleged, unlawful seizure.  The Fourth Amendment proscribes unreasonable seizures, and as delineated previously, the seizure at issue here resulted from the grand jury process, particularly Hearn's and Sheffield's testimony at the grand jury proceeding and Hamilton's prosecutorial duties.  Dillard cannot sustain his claim upon a theory that Hearn and Sheffield merely memorialized fabricated evidence in a couple of documents.  *See Williams*, 965 F.3d at 1167 ("Because Williams complains he was seized in violation of the Fourth Amendment, *the relevant injury is the seizure that followed the arrest warrant, not the broader prosecution*." (emphasis added) (citing *Whiting v.*

---

[10] And *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), does not aid Dillard in this regard either.  In *Buckley*, the Court determined that prosecutors did not enjoy absolute immunity when they allegedly fabricated evidence while exercising investigative functions, not prosecutorial functions.  *Id.* at 272–76.  And importantly, the Court acknowledged an important assumption about its decision: the prosecutors perpetrated "constitutional violations for which § 1983 provides a remedy."  *Id.* at 261.  As the Court admonished, evaluators should not "conflate the question whether a § 1983 plaintiff has stated a cause of action with the question whether the defendant is entitled to absolute immunity for his actions." *Id.* at 275 n.5.  Thus, the Court emphasized that precluding a prosecutor from enjoying absolute immunity for fabricating evidence in performing an investigative role does not translate into § 1983 liability for the alleged fabrication.  That is, the *Buckley* decision addressed the contours of absolute prosecutorial immunity, not a Fourth Amendment malicious prosecution claim.

*Traylor*, 85 F.3d 581, 584 (11ᵗʰ Cir. 1996) ("[T]he Fourth Amendment protects against 'searches' and 'seizures' (and not 'prosecutions') . . . ."), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384, 389–90 (2007))); *Laskar*, 972 F.3d at 1297 ("In *Williams*, we held that '*the relevant injury' for a claim of malicious prosecution under the Fourth Amendment, 'is the seizure that followed the arrest warrant, not the broader prosecution.*'" (emphasis added) (quoting *Williams*, 965 F.3d at 1167)).

Essentially, Dillard's entreaty in this regard elicits a causation determination: principally, Hearn and Sheffield's creation of the documents at issue did not cause his detention. Rather, their testimony during the grand jury proceeding, and Hamilton's solicitation of such testimony, caused the detention at issue. *See Williams*, 965 F.3d at 1167 (delineating causation as an issue for malicious prosecution claims (citing *Baker v. McCollan*, 443 U.S. 137, 142 (1979) ("[A] public official is liable under § 1983 only if he causes the plaintiff to be subjected to [a] deprivation of his constitutional rights."); *Paez*, 915 F.3d at 1285 (explaining that the common-law elements of malicious prosecution require the plaintiff to prove that the defendants "caused damage to" him))). And those actions garner absolute immunity as to the alleged Fourth Amendment malicious prosecution claim.

To be sure, the Supreme Court posited that if a grand jury proceeding is tainted by fabricated evidence, "and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights." *Manuel v. City of Joliet, Ill.,* 137 S. Ct. 911, 920 n.8 (2017). However, the Court set forth this

understanding based upon an unlawful detention that commenced with the use of fabricated evidence for a warrantless arrest, and continued with the inclusion of such evidence in a criminal complaint relied upon in a probable cause determination to continue detention. *Id.* at 915–916, 919. Thus, the grand jury's consideration of fabricated evidence to issue an indictment failed to extinguish the lack of probable cause underlying the litigant's pretrial detention. *Id.* at 920 n.8. Notably, the *Manuel* decision did not abrogate *Rehberg* in this regard. Therefore, although unlawful detention claims stemming from other uses of fabricated evidence at legal proceedings may still garner relief, absolute immunity still precludes a claim for the tainted testimony rendered during a grand jury proceeding.

In a similar vein, the afore-discussed precept in *Manuel* may countenance "a claim under the Fourth Amendment for a seizure that followed an indictment." *Williams*, 965 F.3d at 1168 (citing *Manuel*, 137 S. Ct. at 920 n.8). In *Williams*, the Eleventh Circuit declined to delineate such a claim, yet in *Washington* the Court reviewed the contours of such a "continued detention" claim, that is, where detention continues unlawfully after the conclusion of legal process. In that decision, the Court clarified that "a police officer cannot intentionally or recklessly make material misstatements or omissions in later testimony to continue detention, such as at an arraignment, indictment, or bond hearing." *Washington*, 25 F.4th at 907 (citing *Manuel*, 137 S. Ct. at 920 n.8). As revealed, a continued detention claim requires that a defendant affirmatively act to continue a prosecution, such as by rendering evidence at a legal proceeding. *Id.* at 906–07; *see id.*

at 912 ("To succeed on a Fourth Amendment claim for a seizure pursuant to legal process in this context, a plaintiff must prove that the officer took an affirmative act to continue the prosecution . . . .'"(citation omitted)).  Dillard's allegations do not contain any references to Sheffield's and Hearn's affirmative participation in any further proceedings after the grand jury indictment that continued his detention.[11]

Therefore, the court will dismiss Dillard's Fourth Amendment claim stemming from the sexual abuse charge.

## III.   Absolute Immunity Bars Plaintiffs' Procedural Due Process Claim Against Hamilton

In Count III of the Amended Complaint, Plaintiffs pursue a Fourteenth Amendment procedural due process claim to challenge the procedure used to set the conditions and amounts of their bonds.  Specifically, Plaintiffs allege that Hamilton violated their procedural due process rights because she requested a grand jury set the

_____

[11] Finally, the *Manuel* precept in the decision's footnote may actually countenance a broad unlawful detention claim regardless of process, particularly for the failure to take affirmative action to rectify the taint of fabricated evidence utilized at a legal proceeding.  *See Manuel*, 137 S. Ct. at 920 n.8 ("Nothing in the nature of the legal proceeding establishing probable cause makes a difference for purposes of the Fourth Amendment: Whatever its precise form, if the proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights . . . .").  In those situations, however, the claim would not present a malicious prosecution claim.  Rather, the claim would constitute a Fourth Amendment unlawful detention due to lack of probable cause, yet the any-crime rule – which insulates officers from Fourth Amendment unlawful seizure claims so long as probable cause existed to arrest an aggrieved for some crime, *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020) – may apply to such a claim.  And in these circumstances, the any-crime rule may readily apply because the grand jury indicted Dillard on several other charges.  Further, the contours of such a claim and the applicability of the any-crime rule reveals that any such claim may not be clearly established for qualified immunity purposes.  Therefore, the court will not evaluate the viability of such a claim given that Dillard did not raise it.

conditions and amounts of their bonds, which purportedly contravenes Alabama law requiring a judicial officer undertake such functions.  Hamilton enjoys the protection of absolute immunity against Plaintiffs' procedural due process claim.[12]

As previously noted, "[a]bsolute immunity . . . applies to the prosecutor's actions 'in initiating a prosecution and in presenting the State's case.'"  *Rehberg*, 611 F.3d at 837 (citing *Imber*, 424 U.S. at 431).  Accordingly, the law entitles prosecutors to absolute immunity for their prosecutorial conduct before grand juries.  *See Rehberg*, 611 F.3d at 837–38.  "To the extent Plaintiff[s] contends that the prosecution improperly sought . . . bail, prosecutors are absolutely immune for actions taken in connection with a bail application which are best understood as components of the initiation and presentation

---

[12] Hamilton argues the court lacks subject-matter jurisdiction over Plaintiffs' procedural due process claim pursuant to the *Rooker-Feldman* doctrine.  "[U]nder what has come to be known as the *Rooker–Feldman* doctrine, lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments."  *Lance v. Dennis*, 546 U.S. 459, 463 (2006) (per curiam).  Notably, "*Rooker–Feldman* . . . is a narrow doctrine, confined to 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'"  *Id.* at 464 (citation omitted).  However, "Rooker–Feldman does not prohibit a 'district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court.'"  *Nicholson v. Shafe*, 558 F.3d 1266, 1274 (11th Cir. 2009) (quoting *Exxon Mobil Corporation v. Saudi Basic Industries Corporation*, 544 U.S. 280, 293 (2005).

Plaintiffs' procedural due process challenge does not implicate any state court judgments, and their claim does not inextricably intertwine with a state court judgment.  To be sure, Plaintiffs express chagrin with the bonds issued against them.  Yet, their procedural due process claim arises from the grand jury's purported setting of their bond conditions at the behest of Hamilton, a measure they deem violates Alabama state law.  As characterized, Plaintiffs' challenge incites the grand jury procedure purportedly used to determine their bond conditions, not any state court judgments.  *See, e.g.*, *Walker v. City of Calhoun, GA*, 901 F.3d 1245, 1259 (11th Cir. 2018) (analyzing plaintiff's claim that the process by which the amount and conditions of bail are set is unconstitutional); *Schultz v. State*, 330 F. Supp. 3d 1344, 1366 (N.D. Ala. 2018) (analyzing whether county's bail procedures violated plaintiff's constitutional rights to substantive and procedural due process).

of a prosecution." *Jones v. Clark*, No. 2:05-CV-005-F, 2005 WL 1126778, at *1 (M.D. Ala. May 4, 2005) (citing *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1149 (2ᵈ Cir. 1995) ("[W]e cannot disagree with the holding of other circuits that actions in connection with a bail application are best understood as components of the initiation and presentation of a prosecution, and therefore are protected by absolute immunity." (collecting cases))); *see also Harmon v. Lux*, No. 220CV165FTM29MRM, 2020 WL 1873583, at *2 (M.D. Fla. Apr. 15, 2020) ("Actions taken in connection with bail applications are prosecutorial and protected by absolute immunity." (citing *Pinaud*, 52 F.3d at 1149)).   Hamilton's actions in purportedly requesting bond amounts from the grand jury occurred in the course of her "role as an advocate for the State." *Mastroianni v. Bowers*, 173 F.3d 1363, 1366 (11ᵗʰ Cir. 1999) (citing *Buckley* 509 U.S. at 273).[13]

Although absolute immunity protects Hamilton from this procedural due process claim, it also appears the claim lacks merit.   To be sure, the applicable provisions do not mention the setting of bond conditions by a grand jury, which is Plaintiffs' chief complaint, and Hamilton has not pointed to any viable provisions.   *See* Ala. Code § 15-13-6(a) ("When an indictment is filed in court charging the defendant with a bailable felony and the defendant fails to give bail in open court, the judge of the court must forthwith endorse on such indictment the amount of bail to be required of the

---

[13] Of course, Plaintiffs cannot hold the grand jurors at fault for a myriad of reasons, yet principally because prosecutorial immunity "is derived from the absolute immunity accorded judges and grand jurors . . . ." *Marrero v. City of Hialeah*, 625 F.2d 499, 507 (5ᵗʰ Cir. 1980) (citing *Butz v. Economou*, 438 U.S. 478, 510 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 422–23 & n.20 (1976)).

defendant."); Ala. Code § 15-13-103 ("Admission to bail is the order of a judicial officer of any court of the State of Alabama, or one of its subdivisions, that the defendant be discharged from actual custody on bail. . . . The amount of bail shall be set in the amount that the judicial officer feels, in his or her discretion, is sufficient to guarantee the appearance of the defendant."); Ala. Code § 15-13-104 ("Judicial officers shall see that the amount of bail is affixed to any warrants of arrests issued by the judicial officer at the time of their issuance for which the defendant is arrested and taken into custody. . . . Judicial officers may delegate the affixation to lawful employees of the court, but the amount shall be set by the judicial officer."); Ala. Code § 15-13-101(2) ("Judicial officer. Any supreme court, appellate court, circuit court, district court, or municipal court judge or any magistrate of any court in this state.").

However, the filings before the court do not describe the exact procedure at issue, so the grand jury may actually just recommend bond conditions and amounts at the behest of a prosecutor for a judge's consideration, not actually set the bond. Furthermore, the filings do not clearly indicate that the grand jury's denotation of bond conditions on the indictment actually caused Plaintiffs' detention.  The arrest warrants caused the initial deprivation of liberty, and a state judge convened their initial appearances within 24 hours of their arrests and addressed bond at that time.  So admittedly, this claim fosters some ambiguity as to its exact nature.

In any event, even if Plaintiffs accurately aver that the grand jury set their bond amounts and conditions, then the procedural due process claim still may fail due to the

availability of an adequate, post-deprivation process in the state court to remedy the alleged deprivation.  A litigant may pursue a § 1983 claim for a procedural due process violation under the Fourteenth Amendment's Due Process Clause.  "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*"  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  "The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process."  *Id.* at 126.  A procedural due process claim "'requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process.'"  *Lakoskey v. Floro*, No. 19-12401, 2021 WL 5860460, at *3 (11th Cir. Dec. 10, 2021) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)).

The focus herein lies upon the third requirement, as Plaintiffs essentially contend the setting of bail by the grand jury, at the request of Hamilton, represented a constitutionally-inadequate process.  Generally, pertinent state actors "must attempt to provide a hearing before it deprives one of life, liberty, or property," typically in "'situations where the State feasibly can provide a predeprivation hearing . . . regardless of the adequacy of a postdeprivation . . . remedy.'"  *Barr v. Johnson*, 777 F. App'x 298, 302 (11th Cir. 2019) (quoting *Zinermon*, 494 U.S. at 132).  However, there exists "no procedural due process violation when the act complained of is the random and

unauthorized act of a state employee for which adequate postdeprivation process is available." *Powell v. Georgia Dep't of Hum. Res.*, 114 F.3d 1074, 1081 (11th Cir. 1997) (citations omitted).  Most critically, as a general matter conduct presents as "random and unauthorized" when a state actor fails to follow an established law, policy, protocol, etc. *See id.* at 1080–82 (finding state welfare agency caseworkers' alleged failure to follow county protocols represented random and unauthorized conduct subject to adequate postdeprivation procedures); *McKinney v. Pate*, 20 F.3d 1550, 1562–63 (11th Cir. 1994) (en banc) (finding predeprivation remedy not necessary for claim involving state actor who acts contrary to established state customs or policies:  "As any bias on the part of the Board was not sanctioned by the state and was the product of the intentional acts of the commissioners, . . . only the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation."); *Bowman v. Alabama Dep't of Hum. Res.*, 857 F. Supp. 1524, 1531 (M.D. Ala. 1994) (holding procedural due process claims "'should not be employed to remedy deprivations which occur at the hands of a state employee who is acting in direct contravention of the state's established policies and procedures which have been designed to guarantee the very protections which the employee now has chosen to ignore.'" (quoting *Easter House v. Felder*, 910 F.2d 1387, 1404 (7th Cir. 1990))); 1 Nahmod, Civil Rights & Civil Liberties Litigation: The Law of Section 1983 § 3:55 ("In effect, if the state has formally established policies and procedures through statutes, rules, or regulations, the conduct of policymakers in violation of those policies and procedures will be considered random

43

and unauthorized.").

In this case, Plaintiffs aver Hamilton violated Alabama laws by securing the grand jury's setting of their bond conditions. Based upon the foregoing review, if such conduct actually occurred (which is not obvious based upon the filings before the court), then such conduct constitutes random and unauthorized acts to which Plaintiffs must demonstrate an inadequate, postdeprivation remedy. And eschewing the analysis required by *Mathews v. Eldridge*, 424 U.S. 319 (1976), for such determinations given the posture of this inquiry, Plaintiffs received adequate postdeprivation remedies as evidenced by their initial appearances before a state court judge who required the same bond conditions purportedly established by the grand jury (docs. 14–1, 14–2); the state judge's consideration of Dillard's motion to reduce bond, in which he actually considered the argument set forth by Plaintiffs here and found the issue moot because a state circuit judge set the bond amounts at the initial appearances (doc. 14–4 at 6); and the Alabama Court of Criminal Appeals' review of the decision regarding the motion to reduce bond (doc. 14–5).

### CONCLUSION

For the foregoing reasons, the court **GRANTS** the County's Motion to Dismiss (doc. 10), Sheffield's Motion to Dismiss (doc. 12), Hamilton's Motion to Dismiss (doc. 14), and Hearn's Motion to Dismiss (doc. 16).

44

**DONE** and **ORDERED** this 31st day of March, 2022.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE